Jamie McGrady
Assistant Federal Defender
FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA
425 G Street, Suite 800
Anchorage, Alaska 99501
(907) 646-3400
(907) 646-3480 fax

Attorney for Defendant

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>MICHAEL SAOFAGA, JR.,<br><br>    Defendant. | Case No. 3:18-cr-00129-TMB-MMS-1<br><br>**DEFENDANT'S SENTENCING SUPPLEMENT** |

Mr. Saofaga is scheduled to be sentenced on January 3, 2020. The parties have previously submitted sentencing memorandums at Dockets 48 and 55. The Court heard testimony from several witnesses on November 5, 2019, and requested supplemental briefing on contested issues in anticipation of sentencing.

## I. The Government Failed to Prove the Application of Either the Assault or Official Victim Enhancement by Clear and Convincing Evidence

Officer Christopher Nelson testified that he was 30 feet from the hotel door when Saofaga emerged. Doc. 86 at 23. Saofaga didn't see him at first, and Nelson testified that he identified himself from 30 feet away. Saofaga looked towards him, and then ran. *Id.* Nelson testified that he was 40 feet behind Saofaga when he raised the firearm in his direction, Doc. 86 at 25. Yet, Nelson claimed to have heard a mechanical click from this substantial distance. *Id.* at 26. Nelson testified that he was the only officer who heard a

mechanical click. *Id.* at 40. He also testified that pursuant to Anchorage Police Department policy, he would have been permitted to legally engage and shoot at Saofaga based on these observations. *Id.* at 27. Nelson testified that he gave multiple verbal commands, but no recording of the commands was captured because his body audio recorder malfunctioned. *Id.* at 31-31.

Although Officer Nelson was in uniform, the majority of law enforcement officers at the scene were dressed in civilian clothes. *Id.* at 34. When shown the defendant's exhibits at the evidentiary hearing, Officer Nelson described the clothing worn by the officers to include jackets, hoodies, backward baseball caps, and flannels. [1]

Ms. Brandi Hardon also testified at the evidentiary hearing. She stated that she saw someone in normal clothes—a flannel shirt, and a backwards hat, chasing Saofaga past the car. *Id.* at 48, 55. She also testified that the law enforcement officers who surrounded her vehicle were dressed in plain clothes, and that she thought she was "being gunned down by street people". *Id.* at 49. Hardon testified that it was dark and hard to see. *Id.* Hardon also testified that she did not know that the men were law enforcement until they broke several of her car windows. *Id.* at 52.

What was not presented at the hearing was the best evidence, which is the video discovered to the defense after the evidentiary hearing and conventionally filed at Docket 69. The video contradicts Officer Nelson's testimony in several important respects.

---

[1] See Docket 81.

The relevant conduct begins just after the four-minute mark. Mr. Saofaga first appears emerging from the lower right-hand corner of the video at 4:18. He is sprinting fast enough that he appears as a blurry figure in a screenshot from the footage:



//

//

//

//

//

//

//

//

//

At 4:19, Saofaga is halfway across the parking lot. He appears to glance backwards, his right arm behind him, his left arm in front of him because he is sprinting. The K-9 is approximately 30 feet behind him, or the length of three parking spaces:



//

//

//

//

//

//

//

//

Just one second later, at 4:20, Saofaga again raises both of his arms, and he appears to be looking behind him but his body is still moving forward:



Officer Nelson testified that this is the moment Mr. Saofaga turned his whole body around and raised his arm. Doc. 86 at 26. That testimony is contradicted by the video. By 4:21, Saofaga is almost out of the parking lot and headed towards the street.

//

//

//

//

//

//



Officer Nelson doesn't appear on screen until 4:22, and he is more than the width of the parking lot away from Saofaga.



The conduct, if it occurred, took place in the span of three seconds, in a darkened parking lot as Mr. Saofaga was sprinting away from Officer Nelson, who was at least forty feet away. Further investigation reveals that Officer Nelson was in fact much further behind. Bruce Johnson, an investigator employed by the Federal Defender Agency, went to the Springhill Suites parking lot and measured the distance between Officer Nelson's location at the moment he first appears on the edge of the surveillance video, and Saofaga's position at that same time. The distance measured was 90 feet (see affidavit attached as Exhibit A). By this point, approximately two seconds have elapsed from the moment Officer Nelson is alleged to have observed Mr. Saofaga raise the gun towards Nelson and Nelson claims to have heard a click. Officer Nelson's 40-foot estimate is unreasonable, unless Mr. Saofaga somehow gained 50 feet of ground from Officer Nelson in the preceding two seconds. It's far more reasonable to conclude that Nelson was simply mistaken with respect to the distance between himself and Saofaga during the pursuit, and that Officer Nelson was in fact approximately 90 feet behind.

Although there were several other law enforcement officers were in the area, none of them claimed to have heard the gun misfire. Based on the significant distance, the amount of traffic on C street at that time of night, and how rapidly the events unfolded, it is unreasonable to conclude that Nelson could have heard the gun misfire. It is far more plausible that Officer Nelson learned of the gun's malfunctioning after the gun was dropped (Doc. 86 at 29) and that he misremembered hearing the click.

*United States v. Michael Saofaga, Jr.*
Case No. 3:18-cr-00129-TMB-MMS-1 Page 7 of 10

Looking at the remaining evidence, Mr. Saofaga's conduct does not rise to the level of an assault on any person when viewed through either evidentiary standard.

When viewed frame by frame, it does appear that Saofaga raises the firearm in the direction of the K-9 behind him. But it also happens within a matter of three seconds, at a moment when he is looking primarily to see where the canine is located. At no time does Saofaga break his stride, turn around, or appear ready to shoot. Even if the Court accepts as a factual matter that Mr. Saofaga raised his firearm in a manner that would have placed nearby persons in fear of injury, there were no law enforcement officers within 90 feet of him, and Nelson was not approaching from the same angle as Mr. Saofaga's trajectory. Merely raising a firearm while running away from a police officer located 90 feet away is insufficient to establish an assault, and the court cannot apply an assault enhancement – much less one that has a disproportionate impact on the sentence imposed – based on such momentary, fleeting conduct.

Given the distance between Officer Nelson and Saofaga in the surveillance video, it certainly does not appear that Nelson would have had a legal right, as he testified, to shoot Saofaga during the pursuit. Simply put, no assault was committed. Neither the generic assault enhancement nor the official-victim enhancement applies.

**II. The Black Angus Shooting Does Not Impact the Guideline Range, and Should not be Considered by the Court when Determining the Appropriate Sentence within the Guideline Range.**

The Ninth Circuit has repeatedly held that the preponderance of the evidence standard applies to sentencing findings. A preponderance of the evidence is not an abstract

concept; instead, it "requires the judge to be convinced 'by a preponderance of the evidence that the fact in question exists." *United States v. Restrepo*, 946 F.2d 654, 661 (quoting *United States v. Streeter*, 907 F.2d 781, 792 (8th Cir. 1990)). The Government has offered little or no evidence to substantiate the claim that Mr. Saofaga was involved in the Black Angus shooting aside from the fact that the incident involved the same firearm. Mr. Saofaga was not charged with that incident, and the parties are in agreement that the incident has no impact on Mr. Saofaga's Guidelines calculation. The Government characterizes this information as merely context for guiding the Court's exercise of discretion, but that is not sufficient to justify its inclusion in Mr. Saofaga's PSR. A PSR is not a scrapbook, and should not be used to legitimize unproven and uncharged allegations, especially when the findings in the PSR will be relied upon by the BOP when deciding many important aspects of Mr. Saofaga's sentence, such as his classification level, where he will be housed, and his eligibility for participation in rehabilitative, educational and vocational programming. Statements included in the PSR must bear some indicia of reliability. *United States v. Petty,* 982 F.2d 1365, 1369 (9th Cir.1993) (as amended) ("Although the Confrontation Clause does not apply at sentencing, a defendant clearly has a due process right not to be sentenced on the basis of materially incorrect information. Due process requires that some minimal indicia of reliability accompany a hearsay statement." (citation omitted)). Because the Government's evidence does not clear that threshold, it is of no practical value to the Court and its inclusion would violate Mr. Saofaga's right to due process. Accordingly, it must be deleted from the PSR.

DATED this 10th day of December, 2019.

                Respectfully submitted,

FEDERAL PUBLIC DEFENDER
FOR THE DISTRICT OF ALASKA

*/s/ Jamie McGrady*
Jamie McGrady
Assistant Federal Defender
Alaska Bar No. 0405022
(907) 646-3405
jamie_mcgrady@fd.org

Certificate of Service:

I certify that on December 10, 2019, a copy of the foregoing document, with attachments, was served electronically on:

Christina Sherman, Assistant U.S. Attorney

*/s/ Jamie McGrady*

*United States v. Michael Saofaga, Jr.*
Case No. 3:18-cr-00129-TMB-MMS-1         Page 10 of 10